IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL No. 1:18CR00030-001 |
| v. | ) | |
| | ) | Sentencing Date: November 30, 2018 |
| Donnell Leroy Williams | ) | |
| Defendant | ) | The Honorable Claude M. Hilton |
| _____ | ) | |

<u>MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C.§3582(c)(1)(A)</u>

The defendant, Donnell Leroy Williams, through counsel, respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), and order the remainder of his sentence to be served on home confinement, pursuant to 18 U.S.C. §3624(c), the CARES Act, and Attorney General Barr's April 3, 2020 Memorandum.

This motion should be granted because the global COVID-19 pandemic combined with Mr. Williams's advanced age and significant medical conditions (including diabetes, obesity, a history of strokes and advanced heart disease, all delineated in the Pre-Sentence Investigation Report) presents an "extraordinary and compelling reason" for compassionate release.

A Memorandum in support of this Motion is attached.

_____/s/_____

Gregory T. Hunter, Esquire
Attorney for the Defendant
Virginia State Bar No. 45489
2055 North 15th Street
Suite 302
Arlington, Virginia 22201
(703) 527-0808 telephone
(703) 527-0810 facsimile
greghunter@mail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL No. 1:18CR00030-001 |
| vi. | ) | |
| | ) | Sentencing Date: November 30, 2018 |
| Donnell Leroy Williams | ) | |
| Defendant | ) | The Honorable Claude M. Hilton |
| _____ | ) | |

MEMORANDUM IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C.§3582(c)(1)(A)

The defendant, Donnell Leroy Williams, through counsel, respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), and order the remainder of his sentence to be served on home confinement, pursuant to 18 U.S.C. §3624(c), the CARES Act, and Attorney General Barr's April 3, 2020 Memorandum.

This motion should be granted because the global COVID-19 pandemic combined with Mr. Williams's advanced age and significant medical conditions (including diabetes, obesity, a history of strokes and advanced heart disease, all delineated in the Pre-Sentence Investigation Report) presents an "extraordinary and compelling reason" for compassionate release.

Mr. Williams is particularly susceptible to COVID-19 and is more likely to die from the virus due to his advanced age, diabetes and history of strokes and advanced heart disease. His incarceration at FCI Gilmer – with five inmates already confirmed to have the disease according to the Bureau of Prisons – exposes him to a particularized risk of contracting the disease. The virus thrives in densely packed populations, and FCI Gilmer has already proven to be ill-equipped to contain the pandemic and prevent inmates from being infected.

Mr. Williams is also requesting that the warden at FCI Gilmer move for compassionate release on the same grounds as submitted here. Because of the urgency of the spread of COVID-19, both nationwide and within the prison system, we respectfully ask the Court to waive the 30-day waiting period after this submission for the court to order compassionate release. Delaying resolution of this Motion would expose Mr. Williams to undue prejudice considering the rapid spread of the disease and the significant risk of death for a man with his age and co-morbidities.[1]

## FACTUAL BACKGROUND

Mr. Williams was charged in a four-count indictment alleging that he and two co-defendants conspired to distribute narcotics. Upon the government's motion, a prior conviction was established pursuant to 21 U.S.C. §851, making the mandatory minimum sentence this court could impose a full 20 years. Following a plea agreement, Mr. Williams was sentenced to 240 months with the Court's recommendation that he be designated to serve his time at FMC Butner.

Though Mr. Williams has only served a little over 31 months of an effective 210-month sentence, a paltry 16% of the total, Counsel notes that had Mr. Williams been charged after the First Step Act was enacted he would only have faced a 10 year mandatory minimum sentence, and that other district courts and the Bureau of Prisons have released other prisoners well before they served 50% of their sentences, most notably Paul Manafort – a man who also faces a detainer from New York State when his federal sentence is over.

---

[1] As an alternative to granting immediate relief, the Court may also defer ruling on this motion until the end of the 30-day waiting period.  Courts have recognized that § 3582(c)(1)(A)'s 30-day waiting period does not prevent a defendant from *filing* a motion for compassionate release prior to the expiration of the 30-day waiting period.  *See United States v. Gross*, 2020 WL 1862251 (S.D.N.Y. Apr. 13, 2020) (deferring compassionate release grant until 30 days after the warden's receipt of the defendant's request for compassionate release).

SUMMARY OF ARGUMENT

First, the Court should exercise its authority to grant this Motion without requiring full exhaustion or "the lapse of 30 days" from the warden's receipt of Mr. Williams' request. *See* 18 U.S.C. §3582(c)(1)(A). In response to the pandemic, courts across the country have waived the 30-day waiting period in light of the extraordinary circumstances posed by the pandemic and Congress' intent in enacting the First Step Act's compassionate release provision. The First Step Act amended §3582 to eliminate the BOP as the sole gatekeeper of compassionate release because the BOP clearly failed to "properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." [2]The Act also expanded and accelerated access to compassionate release by allowing defendants to file motions for such relief themselves as early as 30 days after submitting a request to a warden asking that the BOP file such a motion, or the completion of an administrative appeal process, whichever occurs sooner. Treating this 30-day waiting period as a jurisdictional bar to this Court's ability to resolve Mr. Williams' motion would frustrate Congress' intent, contradict guidance issued by the Supreme Court, and unnecessarily expose Mr. Williams to undue prejudice.

Second, the pandemic, combined with Mr. Williams' susceptibility to the disease given his history of diabetes, obesity, strokes and advanced heart disease – each of which independently exposes him to grave risks according to the Center for Disease Control – is an "extraordinary and compelling" reason to grant compassionate release. In the last several weeks, federal courts across

---

[2] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (April 2013); *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it.").

the nation have recognized that COVID-19 is an extraordinary and compelling basis to grant compassionate release, finding that defendants face a rapidly growing mortal threat from exposure to the virus in federal prison facilities.[3]

This Court should exercise its authority to grant compassionate release to Mr. Williams. There is simply no doubt that Mr. Williams faces an unacceptable risk of contracting the disease and dying from it so long as he remains in custody. At the time of this writing, the BOP's own COVID-19 website acknowledges 2300 inmates and 200 BOP staff nationwide who have tested positive for the disease, including 57 deaths.[4] At FCI Gilmer, Mr. Williams' current home, 5 inmates have tested positive so far – a number that has grown from just 2 inmates last week. Given the BOP's lack of testing capacity and their abandonment of testing in some facilities altogether,[5] the real number may be much higher. According to local news reports, Attorney General Barr has promised West Virginia Senator Joe Manchin that no new prisoners would be transferred to FCI Gilmer for the remainder of the crisis. [6]

---

[3] *See infra*, Appendix of Authority: Courts Granting Compassionate Release in Light of COVID-19.

[4] Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/

[5] *See, e.g.*, *Louisiana federal prison no longer testing symptomatic inmates for coronavirus due to 'sustained transmission'*, The Lens (Mar. 31, 2020), available at https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/ *See also,* BOP Direct Michael Carvajal's Message to Prison Staff (Apr. 10, 2020), Transcript available at https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Video-transcript-of-BOP-Director-Michael-Carvajal.pdf

[6] http://wvmetronews.com/2020/05/08/manchin-ag-barr-says-transfer-of-federal-prisons-over-as-long-as-pandemic-lasts/

Despite BOP's efforts, they simply cannot adequately safeguard prisoners[7] and prisoners cannot provide even the self-care measures suggested by the CDC, like social distancing, avoiding large groups, practicing good hand hygiene, disinfecting surfaces touched by others, or wearing masks. *See United States v. Skelos*, 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020).

Third, the sentencing factors delineated in 18 U.S.C. §3553 warrant Mr. Williams' release. We respectfully ask that the Court consider all of the arguments we made in our Position on Sentencing that were mooted by the excessive 20 year mandatory minimum sentence, including his over-stated Criminal History Category, the imposition of a Managerial Role Enhancement, his health issues and the much shorter sentences imposed on both of his co-defendants. But we would also like the Court to consider that the driving issue in Mr. Williams' sentencing hearing, the 20 year mandatory minimum sentence enhancement imposed pursuant to 21 U.S.C. §851, would not be legal today.

## ARGUMENT

### I.  The Court Has Jurisdiction To Grant Mr. Williams Compassionate Release Without Delay.

On December 21, 2018, the First Step Act became law.   Among the criminal justice reforms enacted in this landmark legislation, Congress amended 18 U.S.C. §  3582(c)(1)(A)(i) to allow, for the first time, defendants to move for a reduction of sentence based upon extraordinary

---

[7] Developments in non-federal institutions further evidence these concerns. *See also A Jail in Chicago Is Now the Largest-Known Source of U.S. Infections*, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-live-updates.html#link-7634e187; Megan Flynn, *Top Doctor at Rikers Island Calls the Jail a 'Public Health Disaster Unfolding Before Our Eyes'*, Wash. Post (Mar. 31, 2020), https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.

and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]"  First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018).  By providing this exceptionally short 30-day waiting period before a court may act on a defendant's motion for compassionate release, Congress plainly sought to expedite judicial consideration of such motions and expedite defendants' access to the courts.  *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).

In this case, while the 30-day waiting period has not yet passed, this Court should address this Motion without delay.  Section 3582(c)(1)(A)'s 30-day waiting period is simply a claims processing rule, not a jurisdictional bar to the Court's authority to order compassionate release. Accordingly, the 30-day waiting period provision is subject to well-recognized exceptions that apply here.  Due to mortal threat posed by the rapid spread of the virus in prison populations, and Mr. Williams's particular susceptibility to serious illness and death from the virus due to his age, diabetes, obesity, and history of strokes and heart disease, requiring a 30-day delay in this Court's granting of this Motion would be futile and cause Mr. Williams undue prejudice.

A. <u>The 30-day waiting period is not a jurisdictional requirement and therefore may be waived.</u>

The Supreme Court has "stressed the distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."  *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019); *see Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (claims processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times").  To distinguish between

the two, courts must apply a "readily administrable bright line" standard. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). Specifically, the Court inquires whether Congress has "clearly stated that the rule is jurisdictional." *Id.* (citation omitted). When "Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as non-jurisdictional in character." *Davis*, 139 S. Ct. at 150 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006)).

Courts apply the "clear statement" bright line standard by "considering the statutory text (if it speaks in 'jurisdictional terms'); the placement of the rule (if it is located in the jurisdiction-granting provision of the statute); and legislative context." *Stewart v. Iancu*, 912 F.3d 693, 699-700 (4th Cir. 2019). All of these considerations establish that the administrative exhaustion provisions of 18 U.S.C. § 3582(c)(1)(A)(i) functions merely as a claims processing rule, not a jurisdictional requirement.

Though the Fourth Circuit has not specifically addressed whether the 30-day waiting period in § 3582(c)(1)(A) is jurisdictional,[8] it has provided instructive guidance in addressing a similar exhaustion provision in Title VII. *See Stewart*, 912 F.3d at 699-704. Section 2000e-16(c) of Title VII allows employees and job applicants to bypass administrative exhaustion of their discrimination claims when a government agency fails to "take final action" within 180 days of filing an initial complaint. The Title VII exhaustion scheme bears similarities to the 30-day waiting period under § 3582(c)(1)(A).

As the Fourth Circuit noted, "[u]nlike most administrative exhaustion requirements premised on agency action . . . the 180-day waiting period is satisfied by agency *inaction*," *id.*, like

---

[8] The Fourth Circuit has held that the implicit prohibition on motions to reconsider a sentence reduction pursuant to § 3582(c)(2) based upon a retroactive amendment to the Sentencing Guidelines is not jurisdictional and may be waived. *See United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017) (recognizing a "non-jurisdictional" bar to § 3582*(c)(2)*-based motions for reconsideration).

the 30-day waiting period under § 3582(c)(1)(A). Moreover, "Congress passed Section 2000e-16(c) of Title VII in 1972 precisely because of its recognition that federal employees frequently encountered an 'administrative quagmire' in filing charges of discrimination," *id.* at 699, which is similar to Congress's purpose in amending § 3582(c)(1)(A) in the First Step Act. The Fourth Circuit thus concluded that Title VII's 180-day waiting period is "akin to a 'claim-processing' rule that imposes procedural obligations on litigants . . . [and] is not jurisdictional." *Id.* at 701. The same reasoning applies here.

There are additional reasons to conclude that the 30-day waiting period is not a jurisdictional pre-requisite to judicial review. First, the statutory text of § 3582(c)(1)(A does not address the courts' jurisdiction; it merely promotes the "orderly progress of litigation" by stipulating *which party* will file a compassionate release motion, and allows prisoners to move on their own behalf after 30 days from BOP receipt of an inmate's request to file such a motion. "A statutory condition that requires a party to take some action before filing a lawsuit is not automatically 'a *jurisdictional* prerequisite to suit'"; instead, "the jurisdictional analysis must focus on the 'legal character' of the requirement." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) (emphasis in original); *see also Stewart v. Iancu*, 912 F.3d at 701 ("Simply because [Title VII's] 180-day waiting period is 'cast in mandatory language' does not render it jurisdictional."). And here, the legal character of the 30-day waiting period "simply delineates the process for a party to obtain judicial review, [and does] not refer to the adjudicatory capacity of courts." *United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (concluding that the exhaustion requirement in § 3582(c)(1)(A) is a claim-processing rule that does not deprive this Court of jurisdiction" and that the court "has the discretion to waive the exhaustion requirement § 3582(c)(1)(A)").

In other words, the 30-day waiting period provision is not designed to allow the BOP time to provide the relief sought by the defendant, potentially to avoid the need for judicial review. Such review is required regardless of whether a compassionate release motion is filed by the defendant or the BOP. The provision thus "does not reflect unqualified commitment to administrative exhaustion," to the contrary, it "reflect[s] acknowledgement that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing." *United States v. Russo*, 16-cr-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020) (emphasis added).

Second, the exhaustion requirement is not placed in the jurisdiction-granting provision of the statute; it is in the "part of the chapter dealing generally with sentences of imprisonment." *See United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015). "Tellingly, the word 'jurisdiction' or its variation never appears" in § 3582. *Haney*, 2020 WL 1821988, at *3. Moreover, § 3582 as a whole expressly ***confirms*** the courts' sentencing modification authority. Though § 3582(c) states that the "court may not modify a term of imprisonment once it has been imposed," that provision follows § 3582(b), which states that "a sentence to imprisonment can subsequently be" modified, corrected, or appealed and modified "pursuant to" certain provisions. In short, there is no indication that § 3582(c)(1)(A) divests or conditions the courts' jurisdiction on the 30-day waiting period. Instead, it merely sets forth a procedure "pursuant to" which sentence modifications are made.

Third, the legislative context surrounding the First Step Act – which removed the BOP as the sole gatekeeper of compassionate release, and expedited defendants' access to the courts – confirms that the exhaustion provision is not jurisdictional. In allowing defendants to seek compassionate release directly from federal courts, Congress implemented a modest procedural

hurdle – "either exhaust or wait 30 days" – that "substantially reduces the importance" of protecting BOP authority by allowing "a defendant to come to court before the agency has rendered a final decision." *Haney*, 2020 WL 1821988, at *3.  Moreover, Congress amended § 3582 to allow defendants to seek redress directly from federal courts following the Department of Justice Inspector General's critical assessment of the previous compassionate release framework: "not all [BOP] institutions have timeliness standards, and for those institutions that do, the timeframe ranges from 5 to 65 days"; "the process available to inmates to appeal a Warden's or Regional Director's denial of a compassionate release request can take up to more than 5 months to complete"; and that "BOP cannot determine if requests are processed in a timely manner because the BOP does not track the time it takes to approve or deny requests."[9]

Congress's intent in amending the statutory framework for compassionate release strongly weighs in favor of the conclusion that courts have the authority to waive the 30-day waiting period under the current circumstances.  Given "the multiple demands that the BOP has faced for many years in this era of mass incarceration [the Court] can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial."  *Haney*, 2020 WL 1821988, at *3.  But the statutory text reflects that "Congress was determined not to let such exigencies interfere with the right of a defendant to be heard."  *Id.*

Consequently, Congress's provision for prompt judicial review is even more critical in light of the deadly and rapidly spreading COVID-19 pandemic.  *Id.*  "In essence, the 30-day rule was meant as an accelerant to judicial review . . . . and it would pervert congressional intent to treat it as a substantial obstacle to effective judicial review."  *United States v. Russo*, No. 16-cr-

---

[9] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at ii-iii (April 2013).

441 (LJL), ECF No. 54, at 5 (S.D.N.Y. Apr. 3, 2020).[10]  Accordingly, when "BOP has not been able to satisfy its obligation to act expeditiously . . . or to assure the Court it can do so . . . the Court can exercise the power Congress has given it" in the extraordinary circumstances of COVID-19.  *Russo*, 2020 WL 1862294, at *7.

> B. <u>The Court should waive exhaustion because Mr. Williams is at grave risk of contracting a fatal disease and pursuing administrative remedies would be futile and unduly prejudicial.</u>

Because the § 3582(c)(1)(A) waiting period is non-jurisdictional, the Court may excuse Mr. Williams's failure to exhaust his administrative remedies if: (1) exhaustion would be futile; (2) the administrative process is incapable of granting adequate relief; or (3) pursuing agency review would subject Mr. Williams to undue prejudice.  *See, e.g., Orr v. Assurant Employee Benefits*, 786 F.3d 596, 602 (7th Cir. 2015).[11]

Indeed, given COVID-19's unprecedented and unique threat to people confined to prisons, courts throughout the country have applied these well-recognized exceptions in waiving exhaustion under the First Step Act.  *See, e.g., Haney*, 2020 WL 1821988, at *4 (S.D.N.Y. Apr.

---

[10] C*f. Gonzalez v. Thaler*, 565 U.S. 134 (2012) ("Treating § 2253(c)(3) as jurisdictional also would thwart Congress' intent in AEDPA to eliminate delays in the federal habeas review process.") (quotation omitted); *Stewart*, 912 F.3d at 703 ("Our conclusion also comports with the broader purpose of Title VII as a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.").

[11] *See also Garza v. Davis*, 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility exception in context of § 2241 petition); *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 239 n.2 (3d Cir. 2005) ("[E]xhaustion would be futile, given that Woodall is not challenging the application of the BOP regulations, but their validity."); *Elwood v. Jeter*, 386 F.3d 842, 844 n.1 (8th Cir. 2004); *Fournier v. Zickefoose*, 620 F.Supp.2d 313, 317 (D. Conn. 2009); *Boucher v. Lamanna*, 90 F.Supp.2d 883, 887 (N.D. Ohio 2000) (concluding that exhaustion of administrative remedies would be futile where the BOP's policy on categorizing the prisoner's offense as a violent crime was mandatory, the issue was a legal one that BOP had consistently defended, and the potential for immediate release counseled timely consideration of petitioner's case).

13, 2020) ("Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually *favors* such waiver, allowing courts to deal with the emergency before it is potentially too late.") (emphasis added); *United States v. Jones*, No. 3:11-cr-249, Dkt. No. 47 (E.D. Va. Apr. 3, 2020) ("Given Jones's unique circumstances and the exigency of a rapidly advancing pandemic, requiring Jones to exhaust administrative remedies would result in undue prejudice and render exhaustion of the full Bureau of Prisons administrative process both futile and inadequate.").[12]

Pursuing administrative remedies would be futile in this case because BOP has presumptively deemed Mr. Williams ineligible for relief.  BOP represents that, on March 26, it "began immediately reviewing all inmates who have COVID-19 risk factors . . . to determine which inmates are suitable for home confinement."[13]  Because BOP has not identified Mr. Williams for early release or home confinement, and because BOP has made no representation

---

[12] *See also United States v. Sawicz*, 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) ("The delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences."); *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at * 2 (D. Conn. Apr. 2, 2020) (requiring exhaustion would subject defendant to "undue prejudice – the heightened risk of severe illness – while attempting to exhaust her appeals"); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (waiving exhaustion where defendant's "age and underlying health issues, when considered in light of the spread of COVID-19, demonstrate that further delay could likely result in such catastrophic health consequences, including death"); *United States v. Zukerman*, 16 CR 194, 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (Defendant's "advanced age and compromised health, combined with the high risk of contracting COVID-19 at Otisville, justify waiver of the exhaustion requirement."); *United States v. Perez*, No. 17-cr-513-3, 2020 WL 1546422, at *1 (S.D.N.Y. Apr 1, 2020) (Defendant's "exhaustion of the administrative process [under the First Step Act] can be waived in light of the extraordinary threat posed – in his unique circumstances – by the COVID-19 pandemic.").

[13] Fed. Bur. of Prisons, COVID-19 Home Confinement Information, available at https://www.bop.gov/coronavirus/

that it intends to grant Mr. Williams' request, the Court can find that BOP has deemed Mr. Williams unsuitable for home confinement or early release.  Accordingly, it would be futile for Mr. Williams to pursue his administrative remedies.

Second, any relief that could be granted through the administrative process would be plainly inadequate because it would require Mr. Williams to suffer irreparable harm by continuing to face the lethal threat of COVID-19.  BOP typically takes months to address the requests of inmates for compassionate release even under better conditions.[14]  Given the pandemic, the system is undoubtedly overwhelmed with new requests – a reality that will further bog down and delay the process, all the while exposing Mr. Williams to an increasing risk of infection, serious illness, and even death.  Exposing Mr. Williams to that increasing risk is an irreparable harm that renders relief inadequate.

Finally, forcing Mr. Williams to exhaust his administrative remedies will be unduly prejudicial.  Mr. Williams' health is negatively impacted by the outbreak even though he has not yet been infected: The conditions at BOP prejudice Mr. Williams' ability to follow the hygiene and social distancing recommendations of the CDC, which prejudices his ability to avoid infection, in an environment extremely conducive to spread. Finally, and most importantly, if the virus reaches Mr. Williams, it very well could make him extremely ill or kill him, a prejudice that is definitely undue.[15]

---

[14] See BOP Report on Compassionate Release, at ¶G (showing that nonterminal-illness compassionate release requests took on average between 58 and 117 days to be addressed by the BOP).

[15] A Connecticut state prisoner who was approved for discretionary release died after contracting COVID-19 while attempting to locate an appropriate home sponsor.  *CT inmate approved for release dies with coronavirus*, CT Post (April 13, 2020), available at https://www.ctpost.com/news/coronavirus/article/Inmate-approved-for-release-dies-with-COVID-19-15198054.php

In these dire circumstances, the Court should waive the administrative exhaustion requirement in § 3582.

## II. This Court Possesses Statutory Authority to Modify Mr. Williams' Sentence Due To Mr. Williams's Age, Medical Conditions, and the Threat Posed by COVID-19.

This Court has authority to order Mr. Williams' immediate release [or in the alternative, into home confinement]. Section 3582(c)(1)(A)(i) states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

When enacting § 3582(c) as part of the Crime Control Act of 1984, Congress tasked the Sentencing Commission with defining the phase "extraordinary and compelling," and also required that any judicial order modifying a sentence be "consistent with applicable policy statements" issued by the Sentencing Commission. *See* 28 U.S.C. § 994(t). The Sentencing Commission followed the directive and issued a policy statement, but that policy statement has not been updated to reflect changes made by the First Step Act of 2018.[16]

The Commission's current policy statement further sets forth the following factual considerations for determining whether compassionate release is appropriate: (i) the medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration

---

[16] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); (iii) the family circumstances of the defendant (where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver); and (iv) "other reasons" as determined by the BOP.  U.S.S.G. § 1B1.13, Application Note 1(A).  The fourth category specifically includes "an extraordinary and compelling reason other than, or in combination with," the first three.  *Id*.[17]

It is the Courts' role to determine what "other reasons" warrant compassionate release, notwithstanding the Commission's outdated policy statement that provided for BOP to make that determination.  "Under the First Step Act, it is for the court, not the Director of the Bureau of Prisons, to determine whether there is an 'extraordinary and compelling reason' to reduce a sentence." *United States v. Maumau*, 2:08-cr-758-TC, 2020 WL 806121, at *7-8 (D. Utah Feb. 18, 2020).  Numerous courts have recognized the judicial authority to find that compassionate release is warranted for "other reasons" than those set forth in U.S.S.G. § 1B1.13.  *See, e.g.*, *United States v. Redd*, Case No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)").[18]

---

[17] Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  U.S.S.G. § 1B1.13, Application Note 2.  In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction."  *Id.*

[18] *See also United States v. Perdigao*, No. 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020) ("Many courts have concluded that . . . the Sentencing Commission does not have a policy position applicable to motions for compassionate release filed by defendants pursuant to the First Step Act."; *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331,  at *1 (E.D. Pa. Apr. 1, 2020) (""the scope of the old

**III.** **The COVID-19 Pandemic Presents an Extraordinary and Compelling Reason for Mr. Williams' Compassionate Release Due to Mr. Williams' Particular Vulnerability.**

A. <u>COVID-19 presents a national and global emergency.</u>

Since January 2020, COVID-19 has spread widely – and rapidly – throughout the United States. Positive cases have been confirmed in all 50 states, the District of Columbia, Puerto Rico, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands.[19] Since March 21, 2020, the total number of confirmed cases in the United States has skyrocketed from 15,219 to 1,500,000 as of May 20; the number of deaths have risen more than 100-fold, from 201 to 92,000. *Id.* As of May 20, 2020, the Bureau of Prisons reported that 4444 inmates and 577 staff members have tested positive for COVID-19; 2177 inmates and 389 of the staff have recovered. *See* Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at <u>https://www.bop.gov/coronavirus/</u>. As we noted earlier, Mr. Williams is housed at FCI Gilmer where there are six reported cases (with one recovery) and a bar to new inmates entering the facility until the crisis is over.

These numbers are growing exponentially, and almost certainly understate the problem, as the United States in general, and prisons in particular, are vastly behind where they need to be in testing for this virus. Given the rapid onset of symptoms and the fact that many people are asymptomatic at the outset, the unfortunate reality is that once there is a positive case, it may be too late to prevent further spread.

---

policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i).'"); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." (internal citation omitted).

[19] *See* CDC, *COVID-19 Cases in the US*, available at <u>https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html</u>.

B. <u>Mr. Williams faces a significantly higher risk of contracting COVID-19 because of the conditions of confinement.</u>

The nation's prison system is particularly ill-equipped to handle the spread of a disease as contagious and deadly as COVID-19.  COVID-19 can enter a detention facility and spread rapidly, *entirely undetected*.  Indeed, the Director of the CDC recently warned that up to 25 percent of people infected with COVID-19 "may not show symptoms."[20]  The virus has already spread rapidly in BOP and state facilities.[21]   Due to the crowded and confined nature of a detention facility, the spread of the virus in the prisons and jails is far outpacing its spread in the community.

Conditions of confinement create the ideal environment for the transmission of contagious disease.[22]  "Prisons are petri dishes for contagious respiratory illnesses."[23]  Inmates cycle in and out of jails and prisons, and people who work in the facilities leave and return daily.  According to

---

[20] Apoorva Mandavilli, "Infected but Feeling Fine: The Unwitting Coronavirus Spreaders," *New York Times* (March 31, 2020) available at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html (last visited Apr. 1, 2020).  *See also* CDC, "How Coronavirus Spreads" webpage ("Some spread might be possible before people show symptoms; there have been reports of this occurring with this new coronavirus . . ."), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last visited Apr. 1, 2020)

[21] *See* Timothy Williams, Benjamin Weiser and William K. Rashbaum, "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," *New York Times* (Mar. 30, 2020), *available at* https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last visited April 1, 2020) ("Hundreds of Covid-19 diagnoses have been confirmed at local, state and federal correctional facilities — almost certainly an undercount, given a lack of testing and the virus's rapid spread — leading to hunger strikes in immigrant detention centers and demands for more protection from prison employee unions").

[22] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[23] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[24]   Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[25]   The conditions of confinement not only affect incarcerated individuals, but also the community at large.   "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[26]

In granting compassionate release, courts acknowledge that defendants are at grave risk **despite** BOP precaution.   "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others." *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho. Apr. 7, 2020); *see also United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) ("[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

---

[24] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[25] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) at  https://bit.ly/2TNcNZY.

[26] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks*, The Justice Collaborative, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.

Accordingly, Courts in the Fourth Circuit and across the country have concluded that a defendant's vulnerability to COVID-19 constitutes an "extraordinary and compelling reason" in favor of compassionate release.  *See, e.g.*, *United States v. Jones*, No. 3:11-cr-249 (E.D. Va. Apr. 3, 2020) (granting compassionate release and converting remainder of sentence to home confinement in light of "the current public health crisis caused by COVID-19"); *United States v. Edwards*, No. 6:17-cr-3-NKM, 2020 WL 1650406, at *6 (W.D. Va. Apr. 2, 2020) (granting compassionate release); *United States v. Collins*, No. CCB-10-336, 2020 WL 1506176 (D. Md. Mar. 30, 2020) (granting compassionate release to a "non-violent drug offender who has already served a lengthy sentence" even though "it has not been proffered that [defendant] has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release"); *United States v. Copeland*, Case No. 2:05-CR-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments defendant has during this current pandemic").  Indeed, one court has noted that "the persuasive precedent for granting compassionate release under the current circumstances is overwhelming." *Miller v. United States*, No. 16-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020).[27]

Finally, this Court has recognized that the "gross disparity" between the sentence that the defendant received and the sentence that he would have received after passage of the First Step Act presented an "extraordinary and compelling reason" for compassionate release.  *United States v. Redd*, Case No. 1:97-CR-00006-AJT, 2020 WL 1248493 (E.D. Va. Mar. 16, 2020).  Although this decision did not address the coronavirus (it was not at issue), it speaks to the issue presented here: if Mr. Williams is not released, he faces a potential death sentence, which is not what

---

[27]*See infra*, Appendix of Authority: Courts Granting Compassionate Release in Light of COVID-19.

Congress or the Court intended at sentencing.  *See, e.g., Edwards*, 2020 WL 1650406, at *6 ("Had the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months.")

    C. <u>Mr. Williams is more likely to suffer severe or fatal effects of COVID-19 because of his age and/or health conditions.</u>

Older individuals and people with preexisting health issues are particularly at risk of experiencing severe side effects or death as a result of this virus.  According to the CDC, the following groups are at high risk for severe illness from COVID-19: (1) people aged 65 and older; (2) people who live in a nursing home or long-term care facility; (3) people with high-risk conditions, such as chronic lung disease or moderate to severe asthma, serious heart conditions, people who are immunocompromised,[28] obese, or have diabetes, renal failure, or liver disease.[29] As noted in the Pre-Sentence Report, Mr. Williams suffers from diabetes, obesity, and a long history of strokes and heart disease.

**IV. Releasing Mr. Williams is appropriate given Mr. Williams's history and characteristics and his rehabilitation while incarcerated.**

In determining whether Mr. Williams' sentence should be reduced based on an "extraordinary and compelling reason," this Court must consider whether Mr. Williams presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).

---

[28] Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of cortisteroids and other immune weakening medications.

[29] *See* CDC, *People Who are at Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html.

*See* U.S.S.G. § 1B1.13(2).   Under the present statutory regime, the existence of extraordinary and compelling circumstances confers on this Court the authority to consider the relevant 18 U.S.C. § 3553(a) factors in determining whether a sentence reduction is appropriate.

A.   Mr. Williams is not a danger.

Mr. Williams is an ideal candidate for release. Mr. Williams is a non-violent offender; is aging and infirm and thus less likely to recidivate; has a good disciplinary record during a long period of incarceration; he has a low security classification; and he is incarcerated at a low-security institution.

Consider cases in Appendix of Authority in which courts granted CR in light of COVID-19 despite violent or otherwise dangerous offense history.   *E.g.*, *Williams* (bank robbery and firearms offenses); *McCarthy* (armed bank robbery); *Jemal* (1951(a); 924(g); 922(o)(1); *Collins* (helpful discussion of defendant's rehabilitative progress at *1).] Mr. Williams is also 57 years old. It is well-established that recidivism risk declines with age.[30]

Additionally, in addressing a defendant's potential danger to the community, courts have found that granting release in the context of the COVID-19 pandemic better ensures public safety by decreasing the prison population.   In a recent decision, the district court found that the "'physical and mental health' factor cuts in favor of release for any defendant during this public health crisis." *See, e.g., United States v. Davis*, No. 1:20-cr-9-ELH, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical

---

[30] *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, Ex. 9 (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2004/200405_Recidivism_Criminal_History.pdf.

treatment if necessary.").[31]  Mr. Williams' release would not present a danger to the public; on the contrary, it only serves to further public safety.

Finally, Mr. Williams has strong support in the community.  This will be essential to his successful reintegration to society upon release.  He has maintained close ties with his family throughout his time in prison.  Backed by this support, and in light of his history, there is no reason to believe Mr. Williams would present a danger to society.

B.  The § 3553(a) factors and Mr. Williams's rehabilitation weigh in favor of relief.

For the last 2½ years, Mr. Williams has been serving a 20 year sentence.  Despite this, he has tried to make the most of his incarceration by participating in programming and working.

There is no doubt that Mr. Williams' prior criminal conduct was serious.  At the time, Mr. Williams was distributing Fentanyl and other drugs to support his own habit. The man Mr. Williams is today is very different from the man who stood before this Court to be sentenced in

---

[31] *See also United States v. Mclean,* No. 19-cr-380, Dkt. No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels,* 8:16-cr-76-JVS, 2020 WL 1482553, at *1(C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee,* No. 19-cr-88, Minute Order (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris,* No. 19-cr-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").

2018.  He has received health care and substance abuse services at FCI Gilmer.  He has support from family in the community.

      C.  <u>Mr. Williams has a viable release plan.</u>

Each day in custody is increasingly risky for Mr. Williams, who has no way to practice "social distancing" or other protectives measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection.  Mr. Williams has formulated a release plan that will adequately address the concerns presented by COVID-19, protect the public, and ensure his successful transition into the community.  Mr. Williams will return to Washington, DC, where he has lived his entire life, to live with relatives and support himself with disability income while he addresses his substance abuse issues.

**V.  In the alternative, the Court should issue a non-binding recommendation that BOP transfer Mr. Williams to home confinement pursuant to the CARES Act.**

If the Court does not agree that the Court is authorized to grant compassionate release, Mr. Williams respectfully requests, in the alternative, that the Court issue a non-binding recommendation to the BOP that Mr. Williams be placed in home confinement for the maximum period permissible, pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), 18 U.S.C. § 3624(c)(2), the Second Chance Act of 2007, and 18 U.S.C. § 3621.

      A.  <u>BOP can and should transfer Mr. Williams to home confinement now.</u>

18 U.S.C. § 3624(c)(1) provides that "The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the

community. Such conditions may include a community correctional facility." 18 U.S.C. § 3624(c)(1).

Before the enactment of the First Step Act, 18 U.S.C. § 3624(c)(2) provided: "Home Confinement Authority.—The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. 3624(c)(2) (2008).  Section 602 of the First Step Act, Pub. L. 115-391, § 404(b), 132 Stat. 5194, 5238 (2018), however, amended § 3624(c)(2) to include the following sentence: "The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum time permitted under this paragraph."  Section 12003(b)(2) of the CARES Act, passed March 27, 2020 in reaction to the COVID-19 pandemic, provides that, during this "covered emergency period" of the COVID-19 National Emergency, "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

On April 3, 2020, the Attorney General made the finding that emergency conditions are materially affecting the functioning of the BOP. This finding "expanded the cohort of inmates who can be considered for home release."[32]  The Attorney General directed that the BOP "immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elton, and similarly situated facilities

---

[32] Attorney General Memorandum for the Director of Bureau of Prisons, "Increasing Use of Home Confinement at Institutions Most Affected by COVID-10" (April 3, 2020) [hereinafter 4/3/20 Barr Memo], *available at* https://www.justice.gov/file/1266661/download (last visited April 11, 2020).

where you determine that COVID-19 is materially affecting operations," or "facing similarly serious problems."[33]  Now that he has exercised this authority, the Attorney General wrote, BOP's "review should include all at-risk inmates-not only those who were previously eligible for transfer."[34]  In other words, the BOP may now transfer prisoners to home confinement for periods longer than the last 10 percent or 6 months of their sentence, and longer than 12 months, the previously applicable limits authorized by §3624(c)(2).

The Attorney General also authorized BOP to immediately transfer suitable inmates without first quarantining them and without electronic monitoring, if appropriate.[35]  Further, he advised that although the BOP should be guided by previous memoranda on factors the BOP should consider in evaluating an inmate's suitability for home confinement, including one issued on March 26, "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."[36]

Counsel would note for the Court that another prisoner sentenced in this District has been released to home confinement despite not having approached serving half or more of his sentence, not having the same significant health issues as Mr. Williams, and having a detainer from New York State requiring him to stand trial there once his federal sentence is complete.[37] If Paul Manafort can be released to home confinement, Mr. Williams can, too.

B.  <u>The Court may modify its non-binding recommendations at any time.</u>

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] https://www.washingtonpost.com/national-security/paul-manafort-granted-home-confinement-due-to-coronavirus-fears/2020/05/13/7746835c-8320-11ea-ae26-989cfce1c7c7_story.html

While the determination about whether Mr. Williams is suitable for transfer to home confinement pursuant to Section 3624 is to be made solely by the BOP, this Court does have power to make a recommendation, and the BOP is required to consider a sentencing court's recommendation as to where a prisoner should serve her sentence. 18 U.S.C. § 3621(b)(4).  Such a recommendation is not part of the sentence subject to appeal.  *United States v. Smith*, 733 Fed. Appx. 86, 88 (4th Cir. 2018), *citing United States v. Ceballos*, 671 F.3d 852, 856 (9th Cir. 2011) (citing other circuits finding the same).  Accordingly, sentencing courts may make these "nonbinding recommendations to the Bureau of Prisons at any time." *Ceballos*, 671 F.3d at 856 n.2.

C.  The Court should exercise this authority in Mr. Williams' case.

The undersigned has no way of knowing whether the Warden of Mr. Williams' facility is considering him for home confinement.  The Warden certainly should: COVID-19 is materially affecting the operations of all BOP facilities, as reflected by the fact that the BOP has placed all facilities on a 14-day lockdown.  It certainly is affecting the Butner complex, which has more reported confirmed positives than other BOP facility, according to BOP's website.  And Mr. Williams' conditions certainly put Mr. Williams within the priority group the Attorney General's April 3 memorandum directed the BOP to evaluate for transfer. The BOP's website states that it is "reviewing all inmates who have COVID-19 risk factors."[38]

Yet, the Attorney General neither listed FCI Gilmer among those facilities that should receive immediate attention (despite promising to stop sending prisoners there[39]) nor explained

---

[38] BOP website "COVID-19 Home Confinement Information," https://www.bop.gov/coronavirus/ (last visited Apr. 11, 2020).

[39] http://wvmetronews.com/2020/05/08/manchin-ag-barr-says-transfer-of-federal-prisons-over-as-long-as-pandemic-lasts/

how BOP is to interpret "similarly affected."[40]   Moreover, BOP's answers to "frequently asked questions" regarding home confinement (FAQs) as of April 8 suggested that it is was only prioritizing review to those who are at least 60 years old, and those who had served at least 50% of their sentences, consistent with Attorney General Barr's March 26 directions, but not his April 3 Memorandum.   Although this document is no longer posted as the FAQ site as of April 15, it has been replaced by vague references to both the April 3 and the March 26 Memoranda from Attorney General Barr.[41]   The site states that BOP has identified a list of candidates and asks outsiders *not* to submit requests for consideration for home confinement.[42]

Before corresponding with Counsel this month, Mr. Williams had never heard that the BOP was now authorized to release those with conditions like his to home confinement no matter how much longer they have to serve.   Before Counsel wrote to him, no one had approached him about whether he wishes to be transferred, or has a release plan.   This provides further evidence that the BOP has not identified him for priority review, notwithstanding that his heart condition alone places him squarely within the group Attorney General Barr directed the BOP to consider.

---

[40] Attorney General Memorandum for the Director of Bureau of Prisons, "Increasing Use of Home Confinement at Institutions Most Affected by COVID-10" (April 3, 2020), *available at* https://www.justice.gov/file/1266661/download (last visited April 6, 2020).

[41] BOP, "Eligibility Requirements," "Frequently Asked Questions regarding potential inmate home confinement in response to the COVID-19 pandemic" website, https://www.bop.gov/coronavirus/faq.jsp (last visited Apr. 11, 2020) ("The eligibility requirements for an inmate to be considered for Home Confinement are set forth in the Attorney General's March 26 and April 3, 2020 Memoranda.").

[42] *Id.,* "Providing Assistance," ("Submitting inmate names is not necessary. BOP staff are able to run and establish lists of inmates who meet the guidance provided by the Attorney General. This process ensures that all eligible inmates who meet the criteria are reviewed and considered for movement to Home Confinement.") (last visited Apr. 11, 2020).

Mr. Williams has a release plan, he has just over 14 years left to serve, and he is at grave risk. Transferring him to home confinement is an appropriate solution for all of the reasons given above in support of his request for compassionate release.  A non-binding recommendation from the Court would help ensure that the BOP promptly considers Mr. Williams for transfer to home confinement, and would hopefully promote Mr. Williams' release without intruding on BOP's authority.

## CONCLUSION

Mr. Williams respectfully requests that this Court order his immediate compassionate release under any supervised release conditions the Court believes to be appropriate:

Respectfully submitted,

_____/s/_____
Gregory T. Hunter, Esquire
Attorney for the Defendant
Virginia State Bar No. 45489
2055 North 15th Street
Suite 302
Arlington, Virginia 22201
(703) 527-0808 telephone
(703) 527-0810 facsimile
greghunter@mail.com

## **CERTIFICATE OF SERVICE**

I certify that on this 21st day of May, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification (NEF) to:

David A. Peters, Esquire
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700 telephone
(703) 299-3980 facsimile
David.Peters@usdoj.gov


_____/s/_____
Gregory T. Hunter, Esquire
Attorney for the Defendant
Virginia State Bar No. 45489
2055 North 15th Street
Suite 302
Arlington, Virginia 22201
(703) 527-0808 telephone
(703) 527-0810 facsimile
greghunter@mail.com

## APPENDIX OF AUTHORITY: COURTS GRANTING COMPASSIONATE RELEASE IN LIGHT OF COVID-19

| | Authority |
|---|---|
| **1.** | *United States v. Cosgrove*, Case No. 15-cr-230-RSM, 2020 WL 1875509, at *4 (W.D. Wash. Apr. 15, 2020) (granting compassionate release in light of "new evidence regarding the evolving COVID-19 health crisis"). |
| **2.** | *United States v. Coker*, 3:14-CR-085, 2020 WL 1877800, at *6 (E.D. Tenn. Apr. 15, 2020) (granting compassionate release "in light of the defendant's serious medical conditions" and COVID-19). |
| **3.** | *United States v. McFarlane*, No. 19-10131-NMG, 2020 WL 1866311 (D. Mass. Apr. 14, 2020) (granting compassionate release in light of COVID-19 pandemic). |
| **4.** | *United States v. McPherson*, Case No. 3:94-cr-5708, 2020 WL 1862596 (W.D. Wash. Apr. 14, 2020) (granting compassionate release to defendant "at risk of COVID-19"). |
| **5.** | *United States v. Ben-Yhwh*, No. 1:15-cr-830-LEK, Dkt. No. 206 (D. Hawaii Apr. 13, 2020) (Defendant's serious medical conditions "combined with the COVID-19 crisis constitute an extraordinary and compelling reason to modify his sentence."). |
| **6.** | *United States v. Kataev*, 16 Cr. 763-05 (LGS), 2020 WL 1862685, at *3 (S.D.N.Y. Apr. 14, 2020) ("Defendant's unique health and family circumstances together, and in light of the COVID-19 public health crisis, constitute 'extraordinary and compelling reasons' to modify Defendant's sentence."). |
| **7.** | *United States v. Smith*, No. 12 Cr. 133 (JFK), 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020) (granting compassionate release to 62-year-old with asthma and high cholesterol with 22 months remaining of 120-month sentence). |
| **8.** | *United States v. Wen*, 6:17-CR-06173 EAW, 2020 WL1845104 (W.D.N.Y. Apr. 13, 2020) (granting compassionate release to 48-year-old defendant with asthma). |
| **9.** | *United States v. Sawicz*, 08-cr-287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (granting compassionate release to defendant with hypertension in light of COVID-19). |
| **10.** | *United States v. Knox*, No. 15 Cr. 445 (PAE), Dkt. No. 1088 (S.D.N.Y. Apr. 10, 2020) (granting compassionate release). |
| **11.** | *United States v. Tran*, CR 08-00197-DOC, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020) (granting compassionate release to defendant with asthma in light of COVID-19). |
| **12.** | *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) ("The Court finds that in the context of the COVID-19 pandemic, these medical conditions [including diabetes and obesity], which render Trent uniquely vulnerable to serious illness if he contracts COVID-19, substantially diminish his ability to provide self-care within the environment of a correctional facility.") (citation omitted). |

| | **Authority** |
|---|---|
| **13.** | *United States v. Henao*, 10-cr-231 (ENV), 2020 WL 1812447, at *1 (E.D.N.Y. Apr. 9, 2020) (granting compassionate release due to defendant's "health issues, elevated risk of dire health consequences due to the current COVID-19 outbreak, and status as a non-violent offender"). |
| **14.** | *United States v. Hansen*, 07-CR-00520(KAM), 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (granting compassionate release even where no "inmates or personnel at [defendant's] current facility have been diagnosed with the COVID-19 virus"). |
| **15.** | *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (granting compassionate release to 65-year-old defendant suffering from "COPD, asthma, and other lung-related ailments" that "substantially increase [defendant's] risk of severe illness if he contracts COVID-19"). |
| **16.** | *United States v. Hakim*, CR 05-40025 (S.D. Apr. 6, 2020) (granting compassionate release to 48-year-old defendant with chronic kidney disease and hypertension). |
| **17.** | *United States v. Zukerman*, 16 CR 194, 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (granting compassionate release where, "[a]lthough [defendant's] original release date may be far off, the threat of COVID-19 is at his doorstep"). |
| **18.** | *United States v. Foster*, No. 1:14-cr-324-02, Dkt. No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"). |
| **19.** | *United States v. Resnick*, 14 CR 810 (CM), 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020) (granting compassionate release due to "(1) the highly infectious nature of COVID-19, (2) the limitations in a prison environment (even a prison medical center) on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and (3) [defendant's ailments]"). |
| **20.** | *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (granting compassionate release for defendant with diabetes, "which substantially increases [defendant's] risk of severe illness if she contracts COVID-19"). |
| **21.** | *United States v. Hernandez*, No. 18-cr-20474, Dkt. No. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer and immunosuppression and just under 12 months left to serve on 39 month sentence). |
| **22.** | *United States v. Brannan*, No. 4:15-CR-80-01, 2020 WL 1698392 (S.D. Tex. Apr. 2, 2020) (granting compassionate release to 66-year-old defendant with high blood pressure and high cholesterol). |

| | Authority |
|---|---|
| **23.** | *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Mr. Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave" in light of COVID-19). |
| **24.** | *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"). |
| **25.** | *United States v. Williams*, No. 3:04cr95/MCR, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) (granting compassionate release for defendant convicted of armed bank robbery and firearms offenses). |
| **26.** | *United States v. Jepsen*, No. 3:19-cv-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) (granting compassionate release to defendant who "suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19"). |
| **27.** | *United States v. Gonzalez*, No. 2:18-cr-232-TOR, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; in normal times defendant's conditions would be manageable but "[t]hese are not normal times"). |
| **28.** | *United States v. Dana*, 14-CR-405-4 (JMF), Dkt. No. 108 (S.D.N.Y. Mar. 31, 2020) (granting compassionate release in light of COVID-19 pandemic). |
| **29.** | *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) (granting compassionate release "for the reasons stated in [defendant's] motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."). |
| **30.** | *United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19, recognizing "individuals housed within our prison systems nonetheless remain particularly vulnerable to infection"). |
| **31.** | *United States v. Powell*, No. 1:94-cr-316-ESH, 2020 WL 1698194, at *1 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case). |
| **32.** | *United States v. Campagna*, 16 CR 78-01 (LGS), 2020 WL 1489829, at *2 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify Defendant's sentence . . . ."). |